UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
Connie Avaras, individually and on behalf of   :
her minor child, A.A.,

                         Plaintiffs,        :

           -against-                 :

Clarkstown Central School District, the Board   :
of Education for Clarkstown Central School
District, and the New York State Education   :
Department
                      Defendants.   :
-----------------------------------------------------------x

COMPLAINT;
DEMAND FOR JURY
TRIAL

CASE NO. 18-CV-6964

## PRELIMINARY STATEMENT

1.     Plaintiff Connie Avaras ("Ms. Avaras" or "the Parent") is forced to bring yet another federal action and endure the painful burdens of litigation simply to get Clarkstown Central School District, the Board of Education for Clarkstown Central School District, (collectively the "District"), and the New York State Education Department ("NYSED") to comply with the law. Ms. Avaras pursued her son, A.A.'s, right to a free and appropriate public education ("FAPE") by requesting an expedited administrative due process hearing and by mounting a vigorous case over a six-day hearing, with detailed post-hearing briefs to the Impartial Hearing Officer ("IHO") as well as to the State Review Officer ("SRO"). She watched as both supposedly impartial officers wholly disregarded her evidence and the substantial legal arguments advanced by the Parent. The District, the so-called Impartial Hearing Officer, and state review apparatus have demonstrated, yet again, that they are determined to fight Ms. Avaras in a war of attrition and battle her at every step to deny legally required benefits. These governmental entities will comply with the law only when expressly compelled by the federal courts to do so.

2.     This complaint seeks such an order. The Parent brings this action on behalf of herself and her son, A.A., pursuant to the Individuals with Disabilities Education Improvement Act

1

("IDEA"), 20 U.S.C. § 1400, *et seq.*, and its implementing regulations, 34 C.F.R. § 300, *et seq.*; New York State Education Law, N.Y. Educ. Law § 4401, *et seq.*, and its implementing regulations, 8 N.Y.C.R.R. Part 200; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act" or "RA"), 29 U.S.C. § 794; and Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983.

3.      A brief summary of the Defendants' conduct toward Ms. Avaras and her son, A.A., is as follows:

    a.      This is the second complaint filed in this Court on behalf of Ms. Avaras against the District and NYSED for violations of A.A.'s right to a FAPE.

    b.      Ms. Avaras filed the first complaint (and subsequent amendments thereto) *pro se*, as she challenged the Defendants' conduct with respect to A.A.'s education from his kindergarten year (when the District improperly declassified A.A.) to his 7th grade year, 2014/15.  This Court issued an order finding that the District had failed to provide FAPE and that the alternative unilateral placement of A.A. by his parents at the Hawk Meadow Montessori School ("Hawk Meadow") was an appropriate placement.  Avaras v. Clarkstown Cent. Sch. Dist., No. 15 Civ. 2042, 2017 WL 3037402 (S.D.N.Y. Jul. 17, 2017).  Significantly, the Court concluded that the IHO and the SRO both ignored critical evidence demonstrating the inadequacy of the District's proposed placement and the adequacy of the Parent's alternative placement.  Id.  The Court went on to dismiss the non-IDEA claims alleged in the complaint.  Id.

    c.      The District filed an appeal from the decision and Ms. Avaras filed a cross-appeal as to the portion of the decision dismissing the non-IDEA claims.  *Pro bono* counsel was engaged to assist the Parent on appeal.  That appeal is pending.

d.      In the meantime, the District refused to pay tuition at the alternative schools for A.A.'s attendance in subsequent years: 2012/13 through the present.  Moreover, shortly after receiving the Court's order as to the first complaint, and upon learning that Ms. Avaras would pursue a cross appeal as to the dismissed claims, the District abruptly reversed its express promise to Ms. Avaras that it would provide for transportation to the school that A.A. attended.  Ms. Avaras relied on that assurance before formally enrolling her child at the second school.

e.      In response to this egregious, retaliatory behavior, the Parent was forced to promptly file a new due process complaint.

f.      The case was assigned to IHO George Kandilakis whom the District pays to hear the dispute.  The IHO held a six-day hearing and denied every relief sought by the Parent without addressing a single one of her legal or factual arguments.  It was as if the hearing had never been held and that the Parent had never presented a case.

g.      When this absurd decision was appealed to the State level, the SRO assigned to the matter was the same one who had previously ignored critical evidence and whose decision this Court reversed for the time period involved in the first complaint to this Court.

h.      This time, this SRO dismissed the appeal on the ground that it was served less than 10 hours late.  The Parent established through affidavit and attached emails that the vendor that had been engaged to effect service inexplicably waited until the next morning before doing so, contrary to explicit instructions.  This failure was not the result of any conduct by the Parent or her counsel.  The evidence was unrebutted by the District.  Yet, without even mentioning this record evidence of good cause, the SRO dismissed the

appeal entirely, even though it was in the SRO's discretion to excuse this immaterial, overnight delay.

4.      This Complaint follows.  Pursuant to 20 U.S.C. § 1415(i)(2)(A), the Parent, on behalf of herself and A.A., seeks reversal of the New York State administrative decision rendered by the SRO on May 17, 2018, dismissing their appeal.  This action is timely commenced within four months of the date of the SRO decision, pursuant to 20 U.S.C. § 1415(i)(2)(B) and N.Y. Educ. Law § 4404(3)(A).

5.      At issue is not only a blatant violation of the IDEA by the District, but a seriously broken system whereby Defendant District pays for the IHO, the IHO simply ignores arguments and evidence from the parent, and the SRO similarly looks for the most convenient and technical way to deny a parent and her son's request for relief.  As a general matter, the IDEA requires exhaustion of administrative remedies, but the facts of this case demonstrate the farcical nature of these costly processes as applied to Ms. Avaras and A.A.  Exhaustion of administrative remedies was attempted and proved utterly futile.

6.      The IDEA requires that the District reimburse the Parent for tuition for each of the relevant years.  The District and NYSED's consistent refusal to meaningfully assess the Parent's arguments and evidence also constitute a violation of the Parent's and A.A.'s constitutional right to due process.  The Rehabilitation Act, the ADA, Section 1983, and state statutes entitle them to injunctive relief as well as monetary damages and the award of attorney's fees.

**JURISDICTION AND VENUE**

7.      The claims herein arise under the IDEA, 20 U.S.C. § 1400, *et seq.*, and its implementing regulations, 34 C.F.R. § 300, *et seq.*; the New York State Education Law, N.Y. Educ. Law § 4401, *et seq.*, and its implementing regulations, 8 N.Y.C.R.R. Part 200; Title II of the Americans

with Disabilities Act, 42 U.S.C. § 12101, *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983.  This court has subject matter jurisdiction over the federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343 and 20 U.S.C. § 1415(i)(2)(A).  The claims herein for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

8.      The Court has supplemental jurisdiction to adjudicate state claims that may arise out of the same facts as the asserted federal claims.  28 U.S.C. § 1367.

9.      Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), as the events giving rise to Plaintiffs' claims occurred in this district and all of the parties reside in this district.

**PARTIES**

10.      Plaintiff Avaras resides in New City, New York, and is the mother of A.A.  Plaintiff A.A. is a minor with a diagnosis of attention deficit hyperactivity disorder ("ADHD"), dyslexia, and a learning disability.

11.      Initials are used in the caption of this action and throughout this Complaint to preserve the confidentiality of the minor in conformity with the privacy provisions of the IDEA, 20 U.S.C. § 1417(c), the Family Educational and Privacy Rights Act, 20 U.S.C. § 1232g, and its implementing regulation, 34 C.F.R. § 99, and Federal Rule of Civil Procedure 5.2(a).

12.      Defendants Clarkstown Central School District and the Board of Education for Clarkstown Central School District (collectively the "District") are a local educational agency ("LEA") within the meaning of the IDEA.  The District is responsible under the IDEA and New York State Education Law for providing a FAPE to A.A. as a New York resident, who has been classified as a child with a disability in need of special education and related services.

13.     Defendant New York State Education Department ("NYSED") is responsible for overseeing the provisions of public education by LEAs in New York State.  Both federal and state laws require that NYSED ensure that students with disabilities are afforded a FAPE. NYSED, a state educational agency ("SEA") within the meaning of the IDEA, receives federal funding under the IDEA and must comply with the IDEA, the ADA, Section 504 of the Rehabilitation Act, and Section 1983.

## STATUTORY AND REGULATORY FRAMEWORK

**A.     The IDEA Generally**

14.     The "purpose" of the Individuals with Disabilities Education Act "is 'to ensure that all children with disabilities have available to them a free appropriate public education.' " T.K. v. N.Y.C. Dep't of Educ., 810 F.3d 869, 875 (2d Cir. 2016) (quoting 20 U.S.C. § 1400(d)(1)(A)).

15.     States receiving federal financial assistance under the IDEA must adhere to the IDEA's procedural and substantive requirements and must ensure that all children with disabilities receive a FAPE.  20 U.S.C. § 1412(a).

16.     To satisfy the requirements of the IDEA, a school district must provide each disabled child with "special education and related services," 20 U.S.C. § 1401(9), that are "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982); see Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist., 137 S.Ct. 988, 1001 (2017) ("[The IDEA] requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.").  The term "related services" is defined to include transportation.  20 U.S.C. § 1401(26)(A).

17. The educational program provided by a school district must be in the least restrictive setting so that "children with disabilities . . . are educat[ed] with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A); 8 N.Y.C.R.R. §§ 200.1(cc), 200.6(a1).

18. A school district must put in place an Individualized Education Program ("IEP"), developed in accordance with the IDEA, for each child with a disability. 20 U.S.C. § 1414(d)(2)(A).

19. "An educational agency must issue an IEP for a resident qualifying child, even if that child has been enrolled in a private school outside the boundaries of the school district." Doe v. E. Lyme Bd. of Educ., 790 F.3d 440, 451 (2d Cir. 2015).

20. The IEP must be in place at the start of the school year. 20 U.S.C. § 1414(d)(1)(A)(i), § 1414(d)(2)(A); see 34 C.F.R. § 300.342(a); 8 N.Y.C.R.R. § 200.4(e)(1)(ii).

21. In New York State, by statute, the school year is deemed to commence on the first day of July of each year. N.Y. Educ. Law § 2(15).

22. The IDEA requires IEPs to be updated annually and to include, among other things, "a statement of the child's present levels of academic achievement and functional performance" and "a statement of measurable annual goals, including academic and functional goals." 20 U.S.C. § 1414(d)(1)(A)(i) (emphasis added).

23. The IEP must describe the "special education and related services . . . that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

24. The IEP must also adequately address transitional planning as required by New York State regulations. See 8 N.Y.C.R.R. § 200.4(d)(2)(ix)(a). The "development of transition goals

and services . . . shall include a discussion with the student's parents" of graduation requirements and the student's progress.  8 N.Y.C.R.R. § 200.4(d)(2)(ix)(b).

25.      If a district submits a substantively deficient IEP, "parents may unilaterally reject it in favor of sending their child to private school and seek tuition reimbursement from the State." T.K., 810 F.3d at 875.  In that event, the remaining issues are "whether the parents' private placement is appropriate to the child's needs" and the balance of the equities.  C.F. *ex rel.* R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 73 (2d Cir. 2014).  "[T]he private placement must be reasonably calculated to enable the child to receive educational benefits." Doe, 790 F.3d at 451 (quotations and citations omitted).

**B.      The IDEA's Procedural Safeguards for Parents**

26.      The IDEA provides "procedural safeguards that enable parents and students to challenge the local educational agency's decisions," Murphy v. Arlington Cent. Sch. Dist., 297 F.3d 19, 197 (2d Cir. 2002) (citing 20 U.S.C. § 1415), including the right to file a due process complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  20 U.S.C. § 1415(b)(6)(a); see also 34 C.F.R. § 300.507(a).

27.      One such procedural safeguard is to ensure that parents have an opportunity to participate meaningfully in the school's formulation of an IEP.  This safeguard is implemented through a series of express legal requirements, including:

      a.      First, parents "must be afforded an opportunity to participate" in Committee on Special Education ("CSE") meetings where IEPs are formulated.  34 C.F.R. § 300.322(d).  Indeed, the "public agency must ensure that a parent of each child with a disability is a member of any group that makes decisions on the educational placement of the parent's

child" and "the public agency must use other methods to <u>ensure</u> their participation, including individual or conference telephone calls, or video conferencing" and must "have a record of its attempt to <u>ensure</u> involvement" if the district is unable to obtain parental participation.  34 C.F.R. § 300.501(b) (emphasis added).

b.      A district can only hold a meeting "without a parent in attendance if the public agency is unable to convince the parents that they should attend."  34 C.F.R. § 300.322(d).

c.      To prove that it made all reasonable efforts to "convince" the parents to attend, the district: must keep a record of its attempts to arrange a mutually agreed on time and place, such as: "(1) Detailed records of telephone calls made or attempted and the results of those calls; (2) Copies of correspondence sent to the parents and any responses received; and (3) Detailed records of visits made to the parent's home or place of employment and the results of those visits."  <u>Id.</u>

d.      The parent must receive an IEP before the first day of school.  <u>B.P. v. N.Y.C. Dep't of Educ.</u>, 2014 WL 6808130, at *8 (S.D.N.Y. Dec. 3, 2014).

28.     If the parent disagrees with the IEP, he or she is entitled to challenge the decision through a due process complaint.  In New York, due process complaints brought under the IDEA and state educational law must be litigated in an administrative hearing before an IHO.  20 U.S.C. § 1415(f); 34 C.F.R. §§ 300.507-13; <u>see also</u> N.Y. Educ. Law § 4404(1); 8 N.Y.C.R.R. § 200.5(i)-(j).

29.     In New York, the school district bears the burden of persuasion and burden of production in the IHO hearing as to the appropriateness of the proposed IEP.  The parent has the burden as

to the appropriateness of an alternative placement for which he or she seeks tuition reimbursement.  N.Y. Educ. Law § 4404(1)(c).

30.    The decisions reached in these hearings are subject to appeal to the SRO.  20 U.S.C. § 1415(g)(1); 34 C.F.R. § 300.514(b); see also N.Y. Educ. Law § 4404(2); 8 N.Y.C.R.R. § 200.5(k).  Once these administrative remedies have been exhausted, either party may seek independent judicial review of the SRO's decision in the state or federal courts.  20 U.S.C. § 1415(i)(2)(A); 34 C.F.R. § 300.516; see also N.Y. Educ. Law § 4404(3); 8 N.Y.C.R.R. § 200.5(k)(3).

**C.    The Law of Pendency**

31.    The pendency and "stay put" provisions of state and federal law protect the right of a child to "stay put" pending both administrative and judicial proceedings brought under the IDEA.  See 34 C.F.R. § 300.518(a); New York Educ. Law § 4404.4(a).

32.    "[D]uring the pendency of any proceedings conducted pursuant to [the IDEA], unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . until all such proceedings have been completed."  20 U.S.C. § 1415(j).

33.    This law serves as an "automatic preliminary injunction," against the school district.  Zvi D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982).

34.    This "injunction" is triggered as soon as an administrative due process proceeding is initiated.  Doe, 790 F.3d at 455-56.

35.    At that point, "[a] school district is responsible for funding educational placement during the pendency of a dispute under the IDEA regardless of whether the case is meritorious or whether the child would otherwise have a substantive right to that placement."  Dervishi v.

Stamford Bd. of Educ., 653 F. App'x 55, 58 (2d Cir. 2016).  If there is no agreed-to IEP, the current placement has been held to be "the operative placement actually functioning at the time when the due process proceeding was commenced."  Id. at 57-58; Gabel v. Bd. of Educ. of Hyde Park Cent. Sch. Dist., 368 F. Supp. 2d 313, 326 (S.D.N.Y. 2005).

**D.      Judicial Review and Remedies**

36.      In an appeal to the federal district court under 20 U.S.C. § 1415(i)(2)(A), the court receives the record of the administrative proceeding and may accept additional evidence at the request of either party.  20 U.S.C. § 1415(i)(2)(C).

37.      When a party seeks judicial review, the federal district court decides whether the requirements of the IDEA have been met.  20 U.S.C. § 1415(i)(2)(C).

38.      In considering a party's claim, the court must identify "objective evidence" as to " 'whether the child is likely to make progress or regress under the proposed [public school] plan,' " Gagliardo v. Arlington Cent. Sch. Dist., 489 F. 3d 105, 113 (2d Cir. 2007) (quoting Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 130 (2d Cir. 1998); and "objective evidence" as to the "appropriateness of a parent's private placement," id. (citing Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 364 (2d Cir. 2006)).

39.      The IDEA provides that the court "shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).

40.      The IDEA provides: "If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private . . . secondary school without the consent of or referral by the public agency, a court . . . may require the agency to reimburse the parents for the cost of that enrollment if the court . . .

11

finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii).

41.    The remedial scope of the IDEA is broad; the Supreme Court has held that 20 U.S.C. § 1412(a)(10)(C)(ii) does not limit the remedies available under 20 U.S.C. § 1415(i)(2)(C)(iii), Forest Grove Sch. Dist. v. T.A., 129 S.Ct. 2484, 2493-94 (2009), noting that, if such limitation were allowed, " 'a child's right to a *free* appropriate education . . . would be less than complete,' " id. at 2494-95 (quoting Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985)).

42.    A parent is entitled to an award of tuition from the school district for a unilateral private school placement when: (a) the school district failed to provide a FAPE; (b) the private school is appropriate; and (c) equitable considerations do not preclude the tuition award. Sch. Comm. of Burlington v. Dep't. of Educ., 471 U.S. 359 (1985). These are known as the Burlington prongs.

**E.    Other Constitutional and Statutory Remedies**

43.    Separate and apart from the remedies under the IDEA, the ADA and Section 504 of the Rehabilitation Act protect "qualified individual[s] with a disability" from discriminatory denial of benefits. 42 U.S.C. § 12132; 29 U.S.C. § 794(a) (Section 504). Where, as here, the benefits at issue are denial of a FAPE, a school district that "act[s] with deliberate or reckless indifference to the student's federally protected rights or with 'bad faith or gross misjudgment' " is liable. Schreiber v. E. Ramapo Cent. Sch. Dist., 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010); see Mark H. v. Hamamoto, 620 F.3d 1090, 1097 (9th Cir. 2010) ("If an organization that receives federal funds violates Rehabilitation Act § 504 intentionally or with deliberate indifference, it may be liable for compensatory damages.") (citation omitted).

44.    42 U.S.C. §1983 also prohibits deprivation of liberty and property interests created by the IDEA by a person acting under color of state law.  M.H. ex rel. K.H. v. Mount Vernon City Sch. Dist., No. 13 Civ. 3596, 2014 WL 901578, at *8 (S.D.N.Y. Mar. 3, 2014).  "[T]he denial of a 'free appropriate public education' has been held a constitutional deprivation which is actionable under Section 1983."  Id.  (citing Quackenbush v. Johnson City Sch. Dist., 716 F.2d 141, 148 (2d Cir. 1983)).

45.    Where the administrative procedural safeguards under the IDEA do not work for a plaintiff due to the misconduct of school officials or other state representatives, a court may order remedies under Section 1983.  See Hartford Bd. of Educ. v. J.A., 976 F. Supp. 2d 164, 188 (D. Conn. 2013).

**STATEMENT OF FACTS**

**A.    Parent's Previous Litigation with District and Court's Ruling in her Favor**

46.    A.A. was born on July 17, 2002.  He attended the Woodglen Elementary School ("Woodglen"), a school within the District, through fourth grade (school year 2011-2012).  A.A. has been diagnosed with ADHD, dyslexia, and a learning disability.

47.    A.A. and his mother's struggles with the District during the early period are described in the First Amended Complaint (June 9, 2015, ECF No. 6) and Second Amended Complaint (December 31, 2015, ECF No. 29) and are not repeated herein.  See Avaras, 2017 WL 3037402. Seeking relief in connection with A.A.'s early school years through 2014/15, the Parent alleged violations of the IDEA, 20 U.S.C. § 1400 *et seq.*, seeking judicial review of the SRO's decision affirming the IHO's decision denying tuition reimbursement and related expenses.  The Parent also sought various forms of relief alleging that Defendants' conduct violated Title II of the ADA, 42 U.S.C. § 12101, Section 504 of the RA, 29 U.S.C. § 794, and 42 U.S.C. §1983.

13

48.     The First Complaint named as defendants the District as well as NYSED.

49.     On July 17, 2017, the District Court issued its Opinion and Order:

(1) granting NYSED's motion to dismiss the complaint in its entirety;

(2) granting the District's motion for summary judgment dismissing the Parent's

non-IDEA claims brought under the ADA, the RA, and Section 1983;

(3) granting the District's motion for summary judgment dismissing the conduct

preceding 2012-2013 on the grounds that they were time-barred;

(4) denying the District's motion for summary judgment as to school years 2012-2013

and 2013-2014, finding that A.A. was denied FAPE in those years, and that A.A.'s

unilateral placement at Hawk Meadow was an appropriate alternative for A.A.; and

(5) remanding to the IHO the narrow issue of whether the equities favor reimbursing the

Parent for the costs associated with A.A.' s private placement at Hawk Meadow for the

school years 2012-2013 and 2013-2014.

See Avaras, 2017 WL 3037402.

50.     The judgment was filed on July 17, 2017.  Id.

51.     On August 14, 2017, the District filed a notice of appeal from the District Court's rulings as to the IDEA claims for school years 2012-2013 and 2013-2014.

52.     In response, on August 24, 2017, the Parent filed a notice of cross-appeal from the District Court's rulings as to the dismissal of the ADA, RA, and Section 1983 claims, and the ruling that the IDEA claim as to prior school years are time-barred.

53.     The appeal and cross appeal are currently pending before the Second Circuit.

**B.**      **The District Retaliates Against the Parent by Rescinding Transportation**

54.      Shortly after the appeals were filed, the District reversed and rescinded its prior decision to provide A.A. with busing to and from his private school.  The facts are as follows:

55.      Prior to the summer of 2017, the District had been providing transportation for A.A. to his private placement while the litigation wended its way through the administrative and judicial stages.  The last agreed upon placement was established in the 2012 IEP, dated September 28, 2012, as an out-of-District program to meet A.A.'s unique educational needs.  A.A. remained under the "pendency agreement" specifically referred to by the District in its Prior Written Notice ("PWN"), dated September 15, 2014.[1]

56.      Thus, the District bused A.A. to Hawk Meadow.

57.      In the meantime, as A.A. finished the 2016/17 school year, he aged out of Hawk Meadow and could not continue there.  The District had not informed the Avaras family about plans to offer a public program for him at the District.  Ms. Avaras and A.A. began researching similar and appropriate high school programs for placement to meet his educational needs.

58.      They identified the New York Military Academy ("NYMA") as a potential nonpublic school suitable for all of A.A.'s needs as well as his post-secondary interests and goals.  Among other things, they were especially drawn to the regimented schedule that reportedly helped children with attention deficits focus and learn more productively.

59.      Because the Avaras family did not have the financial resources to pay for the full-time program that included room and board during the school year, if A.A. attended the school, he

---

[1] The District later claimed that this was done as a mere courtesy to the Parent after she commenced the first due process complaint in 2013, since a separate IHO order relating to A.A.'s brother required the District to bus the younger brother to Hawk Meadow anyway.  This was demonstrably false.  The IEP issued by the District dated September 28, 2012, unquestionably demonstrates that the District had agreed to transportation to Hawk Meadow one year before any litigation even arose.  This was before A.A.'s brother began attending Hawk Meadow.

would have to live at home and be bused to and from the school each day. The distance between his home and NYMA is 28 miles. The distance from his home to Hawk Meadow where the District had regularly bused A.A. was 48 miles.

60. Ms. Avaras contacted the District by phone to notify them that A.A. may be attending NYMA and asking for confirmation that the District would continue to provide busing to that new location as they had to Hawk Meadow in previous years.

61. On July 17, 2017, she followed up with an email to David Carlson, Director of the Committee on Special Education and Supervisor of Pupil Services. Mr. Carlson, of course, was fully familiar with the history of the District's evaluations of A.A. and his disability, as he had approved the similarity of Hawk Meadow's program for the related service of transportation.

62. Mr. Carlson responded by informing Ms. Avaras that he had approved busing for A.A. to NYMA. His written confirmation was contained in an email to Ms. Avaras dated July 25, 2017. Specifically, Mr. Carlson stated that he "let transportation know to go forward with scheduling busing" for A.A. to the new location.

63. Ms. Avaras began working on A.A.'s acceptance to NYMA. Upon acceptance, among other things, the Avaras family paid for A.A.'s uniform.

64. In the meantime, the transportation department at the District and a representative of NYMA began working together on the details of A.A.'s busing. Thus, for example, on July 31st, Christina Canary, NYMA's Admissions Coordinator responded to a question from Maggie Gleeson, the District's Transportation Dispatcher, regarding the school's instructional hours in scheduling A.A.'s morning and afternoon pick up times for NYMA. The two communicated again on August 2nd confirming that A.A.'s afternoon physical education was mandatory.

65.     Ms. Avaras signed the final NYMA paperwork on August 21st, and A.A. began attending NYMA that day, pursuant to its normal orientation curriculum for new students.  As per the school's regulations, A.A. remained in the school's dormitory for the duration of that orientation program.  His regular busing from home to school was now scheduled to commence on September 25, 2017.  A.A. quickly acclimated to NYMA, even during that orientation session. He was highly enthusiastic about his new environment.

66.     In the meantime, the District had filed its appeal and Ms. Avaras had filed her cross-appeal from Judge Roman's decision.  At Ms. Avaras's request, she was granted a meeting with the Superintendent and Assistant Superintendent of the District on August 30, 2017 to discuss A.A., her other son, N.A., as well as the ongoing litigation between herself and the District.

67.     During the course of the discussion, Ms. Avaras stated her view that the District was wasting taxpayer dollars to pursue an appeal from Judge Roman's decision, as well as the fact that she had had no choice but to file a notice of cross-appeal in response to the District's appeal.

68.     The very next day, on August 31, 2017, Ms. Avaras received a call from the District's outside litigation counsel, who said the District had prepared a letter purporting to revoke transportation to NYMA and then asking whether Ms. Avaras would consider withdrawing the case in exchange for the District "reinstating" A.A.'s (pre-existing related service) transportation. Ms. Avaras said, among other things, that she rejected this offer.

69.     After getting off the call, the District's counsel forwarded to Ms. Avaras by email a letter from Thomas Balko (the "Balko Letter"), the District's Director of Transportation, dated August 28, 2017, that is, two days before Ms. Avaras's meeting with the Superintendent.  Yet during that meeting the District made no mention of revoking transportation.  The Balko Letter was a full

17

three days before the District's counsel's call to Ms. Avaras.  It was only after that testy call on August 31st that the letter was emailed to Ms. Avaras.

70. The chronology demonstrates retaliation.  There is no other explanation for why, if the letter was signed on August 28th, it was not sent to Ms. Avaras until after she had had her discussion with the District's Superintendent on August 30th, why it was not even mentioned during that meeting, and why it was only sent by email after the District counsel's call with Ms. Avaras on August 31, 2017.

71. Apart from the telling chronology, the Balko Letter's attempt to justify the reversal of the District's decision was facially meritless.

72. The District purported to revoke the prior written authorization for A.A.'s transportation to NYMA by the Director of the Committee on Special Education and Supervisor of Pupil Services, and the arrangements already made by his department with NYMA for busing.  They took this action without any Prior Written Notice, without scheduling a new CSE meeting, and, instead, on the basis of three specious arguments.  First, the District claimed Ms. Avaras had failed to seek busing by April 1st; second, NYMA was more than 15 miles from A.A.'s home. And, third, Mr. Balko (a director of transportation) opined on special education services, claiming: "it is clear that [NYMA] . . . does not provide services or special education programs similar to what is recommended per [A.A.'s] IEP for the 2017/2018 school year."

73. The August 28th letter's reliance on the IEP was particularly striking.

74. Ms. Avaras never received an IEP packet for the new 2017/18 school year until September 22, 2017.  During her meeting with the Superintendent on August 30th, he had made no mention of a completed IEP or any program being offered.

18

75.     Moreover, the Parent had been given no chance to participate in the formulation of an IEP as the law required.  While the cover letter to the IEP that Ms. Avaras received on September 22nd contained a reference to a May 31, 2017 "Subcommittee on Special Education" meeting, no one in the Avaras household received notice of this meeting and no one was provided any opportunity to participate.

a.     Other irregularities were apparent.  For example, the letter accompanying the IEP showed the Board of Education had not met to review or approve the recommended program as the law required.

b.     Moreover, a Prior Written Notice dated May 31, 2017 that notifies parents about procedural safeguards was only postmarked and sent to the Parent on September 22, 2017 within the IEP packet, almost four months after the alleged May meeting.

76.      The Parent subsequently retained *pro bono* counsel to assist in the appeal to the Second Circuit.  Counsel agreed to also assist on the issues then confronting Ms. Avaras.  On September 18, 2017, on behalf of Ms. Avaras, her counsel sent the District's outside counsel a letter addressed to Mr. Balko, requesting that the District reconsider.  Among other matters, the letter pointed out that it was wholly inappropriate for the head of transportation to be making a determination about A.A.'s educational needs in contradiction to the determination by Mr. Carlson, the director of CSE, who had previously approved busing to NYMA.

77.     Apparently responding to this last point, a letter was sent to Ms. Avaras, purportedly drafted by the Superintendent, dated September 20, 2017.  This letter affirmed Mr. Balko's determination to refuse busing.  It provides no explanation for why busing had been approved and why it was just now being refused.

78.    The most substantive underpinning of the District's revocation was the claim that NYMA does not address the recommendations contained in an IEP received in late September.  Yet, in neither Mr. Balko's letter nor the Superintendent's letter did the District even proffer any support for this conclusion.  Had the District made even a modicum of inquiry with NYMA, it would have learned that, in fact, each of the IEP recommendations hurriedly assembled is addressed through the NYMA program, where A.A. had matriculated on August 21st.

**C.    The Second Due Process Complaint and the Hearing**

79.    On October 4, 2017, Plaintiff through Counsel filed a second due process complaint concerning A.A. against the District and requested an impartial hearing.  Plaintiff sought an expedited hearing for an order to enforce pendency law and an order from the IHO requiring: (1)  the District to reimburse the Parent for the cost of A.A.'s tuition at Hawk Meadow for the school years 2014/15, 2015/16, and 2016/17; (2) the District to pay tuition for A.A.'s attendance at NYMA for 2017/18 through high school graduation; (3) the District to pay reimbursement for boarding costs incurred from September 2018 forward, in light of its refusal to provide A.A.'s pre-existing related service of transportation; and (4) the District to pay the Parent's costs and legal fees for instituting this due process complaint and hearing.

80.    The District's counsel subsequently notified the Parent that IHO George Kandilakis had been assigned to the matter.

81.    A hearing was held and testimony taken over the course of six days:  October 31, 2017, November 6, 2017, November 8, 2017, November 15, 2017, November 29, 2017, and December 5, 2017.  The Parent called seven witnesses to testify, including herself and A.A.  The District also called seven witnesses.

82.    As to each of the school years for which relief was sought, the IHO summarily denied all claims virtually ignoring any evidence or legal arguments presented by the Parent.

**D.     The Law of Pendency as to the 2014/2015 School Year**

83.    At the pre-hearing conference, the IHO stated that the Parent was time-barred from challenging the District's failure to provide FAPE for the 2014/15 school year.

84.    Without waiving her objection to that view[2], the Parent pursued tuition reimbursement as to this year at Hawk Meadow solely pursuant to the pendency and "stay put" provisions of state and federal law, which is not subject to a time-bar.  See supra ¶¶ 31-35 (pendency law).

85.    In her post-hearing brief, the Parent set forth in detail the factual and legal support for applying pendency as well as the fact that, as a matter of public interest, the claim cannot be waived by failing to comply with a statute of limitations.

86.    The IHO wholly ignored these arguments and the law.  He disregarded the 2014/2015 school year altogether, "given the statue [*sic*] of limitations" and did not even mention the law of pendency, much less distinguish it.

87.    This decision reflects not only error that must be reversed but an utter disregard for the legal rights of the Parent to due process.

88.    As of September 2012, A.A.'s then-current placement was also his "operative placement" at Hawk Meadow.  The Parent had rejected the District's proposed IEP and filed a due process complaint in the fall of 2013.  With no public school option, she again unilaterally placed him at Hawk Meadow.  Accordingly, Hawk Meadow, "where [A.A.] was enrolled when the dispute over the proposed [2013/14] IEP arose, constituted [A.A.'s] 'current educational placement' for purposes of [the stay put] provision."  J.E. v. Boyertown Area Sch. Dist., 452 F. App'x 172, 176

---

[2] In fact, the Parent had included a claim for 2014/2015 in her due process complaint of 2013, and the SRO had held the claim was premature.

(3d Cir. 2011) (finding unilateral placement without district consent to be "current educational placement" for stay put).[3]

89.    Hawk Meadow continued to be A.A.'s operative placement in the 2014/15 school year, and this remained true into the 2016/17 school year, with the Parent working each year with Hawk Meadow's district of location, Arlington Central School District, to formulate annual IESPs.

90.    District Court Judge Roman's decision also required a finding that the District constructively "agreed" to Hawk Meadow as the appropriate "current placement." See Avaras, 2017 WL 3037402.  As to school years 2012/13 and 2013/14, the Court concluded that the District did not provide FAPE and that Hawk Meadow was an appropriate placement.  Id.

    a.    If a parent unilaterally places her child in a private school, initiates a due process action, and obtains a favorable ruling, that ruling constitutes an implicit "agreement" by the State to move the child to the private school.  Burlington, 471 U.S. at 372-74.

    b.    Such an agreement obligates the District to provide interim financial support.  See Mackey v. Bd. of Educ. for Arlington Cent. Sch. Dist., 386 F.3d 158, 161-62 (2d Cir. 2004); Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz, 290 F.3d 476, 485 (2d Cir. 2002) ("once the parents' challenge succeeds . . . consent to the private placement is

---

[3] The District acknowledged the rule of pendency as far back as 2014 in a PWN statement: "Transportation is being provided to [an alternative private school placement] based on a pendency agreement.  If the pendency order is overturned, the Committee [on Special Education] agree[s] to hold a program review to discuss transportation."  Contrary to the District's repeated and confused claim that its transportation had only been granted because it was already transporting A.A.'s brother, N.A., to Hawk Meadow, the District had made a separate determination that it was required to transport A.A. there.  This is proven by the 2012/13 IEP, in which the District wrote: "Parent requested transportation and was informed the CSE recommended program and private school program needed to be considered comparable before transportation would be considered.  Private program information gathered was shared with the committee.  The CSE agreed to provide transportation."  This determination had nothing to do with N.A. and nothing to do with the Parent's complaint filed a year later.

implied by law, and the requirements of § 1415(j) become the responsibility of the school district").

c.  Moreover, the SRO subsequently determined that the Parent was entitled to tuition reimbursement for school year 2012/13.  This, too, required an order directing payment of tuition for the placement retroactive to 2012/13.  See Burlington, 471 U.S. at 370; Susquentia Sch. Dist. v. Raelee S., 96 F.3d 78, 86 (3d Cir. 1996).

91.  The IHO ignored all of this and simply assumed, without elaboration, that the statute of limitations barred a claim under pendency.  As noted above, however, pendency and stay put operate as an "automatic preliminary injunction."  See supra ¶ 33.  Moreover, the protections afforded by the stay put provisions of the IDEA are not subject to waiver.

**E.  Evidence as to 2015/16 School Year**

*i.  Pendency*

92.  The Parent reiterated and incorporated by reference the foregoing discussion regarding the law of pendency and "stay put," in her application for tuition as to school year 2015/16.  As with the 2014/2015 year, however, the IHO ignored the pendency and stay put provisions "given the statue [*sic*] of limitations."

93.  There was no basis for this holding because the claim as to the 2015/16 school year was not even arguably time-barred.  The District never argued it was, the parties never discussed a time bar as to this year, and the IHO never hinted it was during the hearing.  His first mention of it is in his decision, and his reasoning remains unknown.[4]

---

[4] To add to the confusion, in the context of his discussion of the 2016/17 year, the IHO made the passing comment that the 2015/16 school year was "the year of pendency."  What he meant by this is entirely unclear as he provided no further discussion of pendency or its impact on tuition reimbursement at all.

94.     In any event, the IHO again erred in failing to apply pendency to school year 2015/16, where A.A. continued to be enrolled at Hawk Meadow with related services provided through the Arlington IESP.

95.     Accordingly, on the basis of pendency and stay put alone, the District was required to reimburse tuition at Hawk Meadow for 2015/16.

          *ii        Denial of FAPE Procedurally and Substantively*

96.     Separate and apart from the law of pendency, the record evidence at the hearing overwhelmingly established that the District's proposed 2015/16 IEP failed procedurally and substantively.  Each of the deficiencies discussed below were fully briefed to the IHO and, yet, he discussed none of them.  He simply swept aside the Parent's claim without ever acknowledging them.

97.     The District's IEP had at least three separate and fundamental procedural defects, each of which rendered it invalid.

98.     Failure to Notify Parent:  First, while the law requires that Parents "be afforded an opportunity to participate" in Committee on Special Education ("CSE") meetings concerning IEPs, the District did not comply with this legal requirement.  See 34 C.F.R. § 300.322(d); supra ¶ 27 (legal requirements).

          a.      The evidence at the hearing proved that the Parent did not receive notice of any CSE meeting and she did not attend.

          b.      The parties had had a long and well-established history of disagreement over whether the Parent received mailings from the District, via regular or certified mail.  The Parent testified at the first due process hearing in 2014 about issues with receiving mail. At the 2017 due process hearing, the Parent again testified regarding the persistent

problem and her communications with the District about the inadequacy of their mailings to provide notice. Moreover, Arnold Fucci, a District representative responsible for the Special Education Department, testified extensively to this on-going problem in prior years.

c.       Yet, as the District admitted, the sole step it took to notify the parents about the upcoming CSE meeting for A.A.'s 2015/16 school year was allegedly sending a notice by mail to the Parent's home.

d.       But the District's own records showed that the mail never reached the Parent: the certified receipts for the meeting notices were "returned to sender," unclaimed. These records not only show that the Parent did not receive the mail and open them, they prove the <u>District knew</u> she had not.

e.       A District witness admitted it made no further effort to notify the Parent, notwithstanding the fact that:

   i.   The District had on file four separate phone numbers for the family. The District did not place a single call.

  ii.   It had on file two email addresses, which it had used on many occasions to communicate with the Parent about A.A.; yet the District made no effort whatsoever to email the Parent about the upcoming CSE meeting.

 iii.   Moreover, even though the District had gone to the Parent's house to hand deliver a letter in the prior year, this avenue of notifying her was also ignored.

f.       The IEP that resulted from a CSE meeting held without the Parent was plainly invalid.

g.      At the hearing, the District sought to shift the blame to the Parent by suggesting that she should have made some efforts to engage with the District. But that is not her burden; the law leaves the burden squarely on the District. See supra ¶ 27; 34 C.F.R. § 300.322(d) (school district can only hold a meeting "without a parent in attendance if the public agency is unable to convince the parents that they should attend."). The District was legally required to document all efforts to "ensure" the parent's participation. Id. None of this happened. See also Anchorage Sch. Dist. v. M.P., 689 F.3d 1047, 1055 (9th Cir. 2012) ("[P]articipating educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the parents.").

h.      Moreover, the District's criticism of the Parent is flatly contradicted by the evidence. The testimony at the hearing proved that when properly apprised of IEP or IESP meetings, the Parent was always willing to participate.

    i.      As the Parent testified, she "would have been there had [she] known about it."

    ii.     And she explained why: "I didn't want to have my children out of district. I wanted a program in District that I had been asking for their entire elementary education. I couldn't afford private school. I wanted a free education, like everyone else had."

    iii.    The District made no effort to discredit this testimony, and the IHO's response was to just ignore it.

i.      Because the District knew the mailed notice never reached the Parent and the District failed to make any other efforts to notify her about the CSE meeting, the District's IEP generated from that meeting was invalid as a matter of law.

26

99.     Untimely IEP: Consistent with the District's cavalier disregard for its legal obligations, the District also failed to issue the IEP in a timely manner.

a.      The District is required to have a written IEP "in effect" for each child with a disability "[a]t the beginning of each school year." 20 U.S.C. § 1414(d)(1)(A)(i), 1414(d)(2)(A); see 34 C.F.R. § 300.342(a); 8 N.Y.C.R.R. § 200.4(e)(1)(ii).

b.      In New York State, the school year is deemed to commence on the first day of July of each year. N.Y. Educ. Law § 2(15).

c.      Here, the IEP not only failed to meet the July 1st statutory deadline, it failed even to be mailed to Parent prior to the start of classes on September 1, 2015.

i.      Indeed, the CSE meeting itself was only held on August 26th, well after the statutory July 1st deadline and a mere four business days before the actual start of classes, September 1st.

ii.     An incomplete IEP was mailed on September 8th, a full week after classes started. The District confirmed the timeline.

iii.    Moreover, there is no evidence that a prior written notice was ever delivered, in violation of 34 C.F.R. § 300.503(a).

d.      The Parent was entitled to tuition reimbursement on this basis alone. 20 U.S.C. § 1412(a)(10)(C)(ii) (tuition reimbursement may be required where district has "not made a free appropriate public education available to the child in a timely manner prior to [private school] enrollment"). Yet the IHO, again, ignored the District's procedural violation without explanation.

100.    Outdated Information in IEP: The IEP was also procedurally invalid in that it relied exclusively on outdated information regarding A.A. and his performance.

27

a.      The IDEA requires IEPs to be updated annually and to include, among other things, "a statement of the child's present levels of academic achievement and functional performance" and "a statement of measurable annual goals, including academic and functional goals." 20 U.S.C. § 1414(d)(1)(A)(i) (emphasis added).

b.      Yet, as Judge Roman concluded as to prior school years, the District failed to use updated information. Avaras, 2017 WL 3037402, at *21. This exact pattern was repeated in 2015/16 (and continued through 2017).

c.      The District's own witnesses all admitted that the 2015/16 IEP was based on outdated information. Because the IEP did not contain A.A.'s "present levels of academic achievement and functional performance," and could not have set appropriate "annual goals" as required by the IDEA, the District denied FAPE. See 20 U.S.C. § 1414(d)(1)(A)(i).

d.      The District's response to this obvious violation of IDEA was again to blame the Parent. It argued that the Parent failed to provide consent for the District to obtain current information from Arlington, the school district where Hawk Meadow was located.

   i.      As the Parent demonstrated to the IHO, the District improperly sought to shift its burden to the Parent. The Parent pointed to the fact that on May 18, 2015, she clearly did provide consent for Arlington to "exchange all pertinent educational information about [A.A.] with [Hawk Meadow] and the school district of residence," Clarkstown Central School District.

      1.  Indeed, she made clear that A.A. would attend Hawk Meadow only "in the event [the District] does not offer a FAPE" for the 2015/16 school

28

year.  She testified that "[t]his is the consent I would sign with Arlington every year, to exchange all [A.A.]'s information with Clarkstown."

2. An Arlington witness confirmed it had in its files a valid 2015/16 consent to share information with the District.

a. Her testimony, coupled with the documentary evidence in Arlington's files flatly contradicted the testimony of District witnesses who claimed that they had reached out to Arlington and been told Arlington had no consent from the Parent.

ii. In short, the District's effort to shift the blame for an outdated IEP to the Parent was thoroughly undermined by the evidence.

e. Rather than updating the relevant information, the District simply copied the prior years' proposed special education programs and related services, word for word. Moreover, the IEP sent to the Parent did not include the critical first and second pages of legal information, i.e. meeting attendees and minutes.  This omission was repeated year after year.

f. As with all other fundamental defects in the District's process, the IHO's response was to ignore the deficiency.

101. The District's failures went beyond violations of procedural requirements of the IDEA. The IEP was substantively deficient in numerous, material, respects.

102. At its core, the IEP recommended that A.A. be placed in an integrated co-taught classroom.  This was plainly inappropriate for A.A.'s education needs.

a. First, the IEP simply reiterated the same faulty recommendations from prior years utilizing identical information.  The failure to update the IEP with current evaluations

29

meant that the IEP could not possibly be "individualized" to meet A.A.'s educational requirements.

b.      Moreover, as to two of those prior years, Judge Roman determined that the District did not offer FAPE.  Avaras, 2017 WL 3037402, at *28.  As the Court determined, the District failed to offer a multi-sensory approach to education coupled with 1:1 assistance and small class size that was so critical to A.A.'s advancement.  Id., at *18, 39, 40, 43.  Nothing changed in 2015/16.  A multi-sensory individualized education was not offered in the IEP.  The same deficiencies the Judge found for prior years were replicated in school year 2015/16.

c.      Far from providing individual attention in a one-on-one setting, the District's proposed integrated co-taught classroom would have 24 to 30 students.  Some of these students would be high achieving learners, while others struggled with learning disabilities.  In this large classroom, there would be only two teachers, one of whom would be a special education teacher.

  i.      The risk of A.A. being immediately identified as a "special education" student in such a class is obvious, and the stigma attached to it was a critical concern.  Both the Parent and A.A. described why this type of classroom environment would be detrimental to A.A.'s academic success.  A.A. testified that he would have been naturally fearful of raising his hand for help in front of his peers.

  ii.      Moreover, as the Parent testified, the program did not offer a multi-sensory approach; it "didn't have the individualized attention component"; "he would have drowned in this class" with 25 students and two teachers.

30

iii.  On cross-examination, a District witness acknowledged that A.A. was substantially behind in his math skills, but rather than giving him individualized attention to increase those skills, the witness said she would have handed A.A. a calculator so he could try to keep up with the rest of his class.

d.  There were other substantive defects in the IEP, as the Parent described in her testimony.

103.  In light of the myriad procedural and substantive deficiencies in the District's IEP and the process leading up to it, the District could not, and did not, satisfy its burden of proving that it offered FAPE.  Yet the IHO swept aside each and every one of the deficiencies with virtually no analysis, finding in favor of the District.

*iii.  Hawk Meadow was an Appropriate Alternative*

104.  With similar dismissiveness, the IHO discounted, *in toto*, the substantial evidence presented by the Parent proving that Hawk Meadow was an appropriate alternative placement for A.A. in school year 2015/16.

105.  In contrast to the District's outdated boilerplate IEP, Hawk Meadow met A.A.'s needs with a "real life" individualized educational program designed to advance his learning.

106.  As the Parent reminded the IHO, under the law, private placement is appropriate if it is "reasonably calculated to enable the child to receive educational benefits," C.F., 746 F.3d at 82, "such that the placement is likely to produce progress, not regression," C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 836 (2d Cir. 2014).  The test "is that it is appropriate, and not that it is perfect." Id. at 837.  The program and services must simply represent "educational instruction specially designed to meet the unique needs of a handicapped child supported by such services as are necessary to permit the child to benefit from instruction." Frank G., 459 F.3d at

31

365. Moreover, the unilateral placement need not employ "certified" special education teachers. Id. at 364. Nor does the school need to be state accredited. Pawling, 290 F.3d at 483 ("We cannot endorse the District's argument that because Kildonan is not state accredited, reimbursement is improper."); Doe, 790 F.3d at 451 (same).

107. Hawk Meadow offered much more than just "appropriate education" for A.A. The educators who taught A.A. during all of 2015/16, as well as 2016/17, gave extensive testimony about the educational program that enabled A.A. to flourish socially, emotionally, and academically in this fully inclusive, yet completely individualized educational environment. His teachers, with their decades of experience, were trained in the Montessori method.

108. First, the evidence established that the program targeted the student's individualized needs. The instruction was essentially differentiated with each child, including A.A., working at his own pace. This is in sharp contrast to the assertion by the District's special education teacher that if A.A. was having trouble with math, they would give him a calculator.

109. This program also essentially eliminated the chances of stigmatizing a learning disabled child. This, again, contrasts with the unavoidable stigma that would ensue for A.A. if he had been placed in the District's large, integrated co-taught classroom where he would be expected to keep up with everyone else. The more likely outcome is that A.A. would shut down and fall farther behind. The Hawk Meadow program avoided this harm.

110. The Parent's witnesses explained in detail how much educational benefit A.A. received from Hawk Meadow's individualized program.

    a. Joyce Ryan, a Montessori teacher for 31 years, who met with A.A. throughout 2015/16, four days a week for 45 minutes of math instruction (with a ratio of 1:1 or at most 3:1) testified extensively about A.A.'s progress. She testified that A.A. "[b]ecame

better with his multiplication facts . . . . His writing became more advanced as far as his sentences . . . and he went on to become abstract in large multiplication, and also be able to do division abstractly as well."

b.      Jody Caffaro, who taught A.A. English and Language Arts, in a 7:2 student to teacher ratio, testified similarly.

c.      Ms. Castle, the director of Hawk Meadow who had frequent observations of A.A.'s performance summed up his progress in all areas.  When A.A. began at Hawk Meadow, he had been at a lower to mid-second grade reading level.  "Probably 2 to 3 years below grade level reading in 2012," but when he left in June 2017, "I would say that he was at grade level."  His scores increased 45 points from one year to the next in language arts.

d.      And his achievements were not just academic: the Hawk Meadow program repaired and began to heal his self-esteem and social confidence.

e.       Moreover, the Parent, who is in the best position to judge a child's progress, also testified to A.A.'s successes at Hawk Meadow during the 2015/16 school year.

f.      A.A. also testified to his own progress at Hawk Meadow in an articulate and reasoned description of the benefits of attending the school.

g.      Dr. Braniecki, A.A.'s neuropsychologist since 2012, met with him in November of 2017 and offered this opinion: "My impression from what A.A. reported to me, is that his academic time – his academic instruction at Hawk Meadow was very positive" and that it "greatly benefited him and he benefited from the pace of the program and the one-on-one attention he received, and the multi-sensory learning experiences that he

received."  The Doctor's "professional opinion was that [Hawk Meadow] was an appropriate setting for him."

      h.      Dr. Roseman, A.A.'s pediatric neurologist, also commented on A.A.'s exceptional progress from when he met with A.A. in 2012 to late 2016.

111.    Against this evidence, the District proffered no witness who claimed that Hawk Meadow did <u>not</u> offer education "reasonably calculated to enable [A.A.] to receive educational benefits." <u>C.F.</u>, 746 F.3d at 82.  To the contrary, Ms. Avecilla, the District's own psychologist, noted that Arlington's 2015/16 IESP (which the Hawk Meadow witnesses participated in) "would address A.A.'s needs."  Even when the surprised District's counsel tried to move her off this position, she repeated it.

112.    The appropriateness of Hawk Meadow's program, of course, is not judged in a vacuum. A.A. had been a student there since the 2012/13 school year, and Judge Roman specifically found that for 2012/13 and 2013/14, Hawk Meadow provided A.A. with a number of benefits that were missing from the District's IEPs, including "small class sizes, integrated student environments, and a multisensory approach to learning." <u>Avaras</u>, 2017 WL 3037402, at *22. The Court opinion stressed the importance of the multisensory approach for A.A. <u>Id.</u>, at *24 ("Hawk Meadow was an appropriate alternative placement for A.A. in that it provided element[s] of special education services in which the [District] was deficient.") (quotations and citations omitted).  The same multisensory approach was used year after year.  The Hawk Meadow witnesses explained its importance and how they applied it.  The Parent testified to its importance for A.A., and A.A., himself, explained why these elements were so important to his ability to learn.

113.    Against this evidence, the District was reduced to criticizing Hawk Meadow by erroneously alleging that it did not administer standardized tests to A.A.  As Joyce Ryan explained, however, Hawk Meadow performs its "own testing with assessing with the materials, and that's how we test.  As a child masters one material, [he is] able to go onto the next.  We see if that child has had progress because he can't go onto the next lesson unless [he's] mastered the lesson before, that's how we test them."  Moreover, "lack of progress on standardized test scores [] is not dispositive as to the appropriateness of placement."  <u>Avaras</u>, 2017 WL 3037402, at *23 (citing <u>S.C. v. Katonah-Lewisboro Cent. Sch. Dist.</u>, 175 F. Supp. 3d 237, 266 (S.D.N.Y. 2016)).

*iv.     Equities Favor Reimbursement*

114.    The third prong of <u>Burlington's</u> test for tuition reimbursement is whether the equities favor the Parent.  The Parent's evidence and arguments to the IHO set forth in detail all the grounds for concluding that equity did in fact favor the Parent.  The IHO did not address this prong, having concluded, erroneously, that the District offered FAPE and that Hawk Meadow was not an appropriate alternative placement.

115.    In contrast to the District's deficient conduct – where it did not notify the Parent of the CSE meeting, and produced an incomplete and outdated IEP after school had started, filled with inappropriate recommendations – the Parent offered compelling testimony that she would have participated in the CSE meeting had she received notice of it.

116.    She further testified that she would have placed her son in a District school if the appropriate placement was offered.

117.    She executed valid consent every year since 2012 for the District's full access to Arlington's records in order to share all of A.A.'s information, including Hawk Meadow's, with

the District. Yet *only one time since 2012* (in 2014) did the District actually request his information from them.

118. She explained that she enrolled him in Hawk Meadow having never received an IEP before the school year started.

119. Her actions were entirely appropriate. See C.D. v N.Y.C. Dep't of Educ., 2016 WL 3453649 (S.D.N.Y. June 30, 2016) (similar actions taken by parent deemed "appropriate" and weighing in favor of parent). The Parent's actions "reflected the double bind parents face" – waiting for a FAPE to be offered while private school seats fill up. Id., at *20.

120. The District made large of the fact that the Parent has not yet paid for Hawk Meadow's tuition. But Second Circuit case law is clear: direct retroactive payment of tuition is appropriate even where the parent has not yet been required to pay tuition. See Mr. and Mrs. A. *ex rel.* D.A. v. N.Y.C. Dep't of Educ., 769 F. Supp. 2d 403, 428 (S.D.N.Y. 2015); A.R. v. N.Y.C. Dep't of Educ., 2013 WL 5312537 (S.D.N.Y. Sept. 23, 2013). Here, the Parent testified that while the Hawk Meadow 2015/16 school year invoice had not yet been paid, "it's an absolute obligation that [they] owe the money to the school." This testimony was unchallenged.

121. Having satisfied all three prongs of Burlington, the Parent is entitled to tuition reimbursement for the 2015/16 school year.

**F.    Evidence as to 2016/17 School Year**

122. The Parent's evidence and arguments as to the 2016/17 school year were similar to those relating to the 2015/16 school year but met the same fate before the IHO. He ignored all of it.

   *i.    Pendency*

123. First, the law of pendency and stay put applied with equal force to 2016/17 and the IHO made no mention of the law at all. The Parent reiterates and incorporates by reference the

36

discussion in paragraphs 31 through 35 regarding the law of pendency and the stay put provisions of state and federal law.

> ii.    *Denial of FAPE Procedurally and Substantively*

124.    Moreover, the District again failed, both procedurally and substantively, to provide FAPE for the 2016/17 school year.

> a.    <u>Failure to Notify Parent:</u>  Just as in 2015/16, the District violated 34 C.F.R. § 300.501(b) by making virtually no effort to ensure that the Parent received notice about the pending CSE meeting.  <u>See</u> <u>supra</u> ¶ 27 (legal requirements).

> > i.    Ignoring overwhelming evidence to the contrary, the IHO concluded that "the CSE had made various attempts without success to notify the parent" and "there was no evidence presented at the hearing that the District's mailing[s] to the parent were not being delivered."

> > ii.    This is demonstrably wrong.  That the IHO could reach such a baseless conclusion in the face of indisputable contrary evidence revealed the extent of his bias in favor of the District.

> > iii.    The evidence showed that, as in 2015/16, Mr. Fucci knew that the Parent had not received the certified mailings, yet he did not take any additional steps to apprise her of the CSE meetings.  The evidence also showed that the certified letter providing notice of a CSE meeting was returned to the District undelivered.  This document was in the District's files.

> > iv.    As in 2015/16, the District did not email or attempt to make a by hand delivery.

v.        Unlike the 2015/16 IEP, the 2016/17 IEP has a notation claiming that one call to the parent was attempted. When, how, or by whom any such call was made remains unknown. The District did not produce any witness who allegedly made the call. Moreover, no reliable record of who placed the call, which number was called, or whether the call was answered by anyone was kept. Thus, as a matter of law, even if any such effort was actually made, the District failed to comply with its obligations. 34 C.F.R. § 300.322(d) requires "detailed records of telephone calls made or attempted and the results of those calls."

vi.        The Parent testified she never received the meeting notices. She further testified that she "would have absolutely attended every meeting" had she been invited. The District simply failed to comply with its legal obligations to ensure the Parent's knowledge of and participation in, a CSE meeting. Its IEP was thus legally invalid.

b.      <u>Untimely IEP</u>: Furthermore, just as in 2015/16, the 2016/17 IEP was not delivered to the Parent until <u>after</u> the school year began. <u>See</u> <u>supra</u> ¶¶ 20-21 (legal requirements). This was yet another fundamental District failure that the IHO ignored entirely.

i.        No Prior Written Notice letter was sent prior to, or with, the IEP and the District provided no supporting evidence that a PWN was sent at all. The Board of Education letter accompanying the IEP was dated September 8, 2016; the postmark on the envelope containing the package was September 9th.

ii.        The letter indicates that the Board did not even meet until September 8th to take up this IEP. School started on September 7th.

    iii.      Failure to have an IEP "[a]t the beginning of each school year" constituted denial of FAPE.  20 U.S.C. § 1414(d)(1)(A)(i), 1414(d)(2)(A).

c.      <u>Outdated Information in IEP:</u>  Moreover, the IEP was even more stale than the previous year.  <u>See</u> <u>supra</u> ¶¶ 22-23 (legal requirements).  It was virtually identical to the prior year's, still without the updated triennial evaluations and test results that Arlington had in its files.  As evidenced by Arlington's own documents, the Parent had signed her annual consent to share all information, which included all current evaluations, between Arlington, Hawk Meadow, and the District.  The Parent testified that she also signed and mailed back to the District a consent for reevaluation, a contention that was supported by the consent document and her contemporaneous notes on the envelope.  Yet, the 2016/17 IEP similarly failed to incorporate Arlington's updated testing and evaluations.  The District failed to reevaluate on its own.

d.      Notwithstanding all of the above evidence, the IHO inexplicably faulted the Parent for not providing consent for reevaluation and blamed the Parent for the District's use of outdated evaluations.

    i.      There is no reasoned analysis for how the IHO could have discounted the evidence wholly undermining his conclusion.  There was no evidence anywhere in the record contradicting the Parent's straightforward testimony that she was always ready to participate in CSE meetings to the extent the District offered them.  The IHO's conclusions are not only factually unsupported, they ignore the legal requirements imposed upon the District.

e.      Indeed, the IHO went further: while ignoring the myriad procedural violations by the District, he holds the Parent strictly to the requirement that a parent provide 10-day

notice to a school district as a separate basis for his denial of tuition reimbursement for the 2016-2017 school year.  Failure to provide notice, however, is not an "automatic bar to reimbursement," and the matter is left to the "court's informed discretion." W.M. v. Lakeland Cent. Sch. Dist., 783 F. Supp. 2d 497, 505-06 (S.D.N.Y 2011).  Moreover, in the instant case, no IEP was even produced in order to have the opportunity for a 10-day fix.

i.       First, the 10-day notice was inapplicable because the parent had not been given an IEP 10 days before school began.

ii.      Moreover, the record evidence leaves no question that the District had full notice, certainly no later than 2014, that barring an offer of FAPE from the District, the Parent expected to continue to send A.A. to Hawk Meadow.  The District knew that A.A. would be re-enrolled at the school for the 2016/17 school year if an appropriate program had not been developed by the District.

iii.     The Parent also communicated with Mr. Fucci and other members of the District about transportation in an email exchange from August 24, 2016 to September 12, 2016.  The District again agreed to continue transportation to Hawk Meadow's new address for the 2016-2017 school year acknowledging that A.A. was indeed enrolled at the school.  Similarly, in email exchanges from July 17, 2017 to August 30, 2017, the District acknowledged that A.A. would now be enrolled at NYMA for the 2017-2018 school year.

iv.      Under these circumstances, the 10-day notice regulation is a highly technical one at best, which in no way prejudiced the District's ability to plan or

40

offer an IEP.  The District was legally required to provide an IEP even if a student is enrolled at a private school.

      v.      Not surprisingly, the District never claimed it was hindered by the lack of written notice in this time-frame.  It was error for the IHO to preclude tuition on this basis.

125.    The IHO also inexplicably declines to address any of the substantive deficiencies in the IEP.  The IEP recommended again a large, co-taught class; the same as the prior year.  The Parent reiterates and incorporates by reference herein the allegations as discussed in paragraph 102.  Simply put, the program would have been profoundly detrimental to A.A.'s academic success.

### iii.    Hawk Meadow was an Appropriate Alternative

126.    In contrast, the evidence again demonstrated that Hawk Meadow was an appropriate placement for A.A. in 2016/17 as it was in 2015/16.  The testimony from Hawk Meadow representatives, the Parent and A.A. in 2015/16 apply with equal force as to 2016/17.  See supra ¶¶ 104-113.

      a.      Yet, the IHO's response to all this was to discount it and to mischaracterize Ms. Ryan's testimony, ignoring evidence of A.A.'s progress at Hawk Meadow.  According to the IHO, Ms. Ryan testified that A.A. "needed to be segregated from the rest of the class and placed at a desk facing the wall for two day [*sic*] because of his attentional issues."

          i.      In fact, Ms. Ryan was simply testifying about a strategy to refocus children who were having trouble paying attention and only as necessary.  A.A. would sit at one of these desks facing the wall "so when he sat down, he had more chances, or more ability to stay focused because . . . he couldn't see the rest of the

classroom." There could be weeks where A.A. "didn't sit at the desk, and he was doing fine and attending to his work. Other times, maybe he sat at the desk for two days straight."

ii.     For a child with attentional deficits, such as A.A., this was a sound strategy to employ only as the student deemed necessary to regain focus, and it did not "segregate" a child from his class.

b.     Overwhelming evidence, including from the Parent and A.A.'s own testimony, demonstrated that A.A. continued to thrive in the small-class, multi-sensory environment Hawk Meadow afforded him.

i.     Jody Caffaro, his 2016/17 English and language arts teacher, testified to his significant progress during that year.

ii.     The Parent similarly described A.A.'s progress in 2016/17.

iii.     The IHO ignored all of this testimony, making no mention of it in his decision.

c.     Instead, he went on to mischaracterize Dr. Braniecki's May 2012 evaluation to conclude that the District's 2016/17 IEP was appropriate because it recommended "a co-teaching program" "consistent with" the Braniecki evaluation.

i.     But the IHO was confusing the Braniecki evaluation, which was created in 2012, when A.A. plainly was still a fourth grade student at Clarkstown and in a self-contained classroom, segregated with disabled peers, for most of the day, with current conditions.

ii. Moreover, far from condoning the District's IEP, Dr. Braniecki recommended far greater one-on-one attention to A.A.  It is impossible to read that evaluation as being "consistent with" the IEP's program.

iii. The IHO ignored Dr. Braniecki's current testimony about the 2016-2017 school year, as she testified that Hawk Meadow "greatly benefited him and he benefited from the pace of the program and the one-on-one attention he received, and the multi-sensory learning experiences that he received."

iv. Her "professional opinion was that [Hawk Meadow] was an appropriate setting for him."

v. Dr. Roseman's letter describing A.A.'s surprising advances also demonstrates that A.A. benefited from Hawk Meadow.  The IHO also did not mention this evidence.

 *iv. Equities Favor Reimbursement*

127. Finally, the equities weigh in favor of reimbursement.  There are no material differences in the Parent's or the District's conduct between 2015/16, see supra ¶¶ 114-121, and 2016/17.

a. The District continued to be shockingly casual in going through the motions rather than ensuring that it complied with its obligations under the IDEA.

b. In contrast, as discussed above, the Parent followed the same routine she had for years, signing consents for the exchange of all information with the District, and participating in the IESP meetings with Arlington, evidencing her intent to be an involved parent.

c. The IHO offers no conclusion to the contrary; he does not discuss equities at all.

**G.      Evidence as to 2017/18 School Year**

> *i.      Pendency*

128.    The Parent reiterates and incorporates by reference the discussion in paragraphs 31 through 35, relating to the law of pendency and stay put.  Again, the IHO failed to address pendency for the 2017-2018 school year.  Pendency fully applies to require payment of tuition for A.A.'s education at the New York Military Academy ("NYMA") for school year 2017/18 and thereafter.

   a.      The 2013 due process complaint, which continues to be litigated, establishes pendency.

   b.      Moreover, when the Parent filed her second due process complaint on October 4, 2017, when A.A. was already attending NYMA, the filing provided another and separate basis for ordering tuition pursuant to pendency.  NYMA was indisputably the operative placement of A.A. at the time of the 2017 due process complaint.  See supra ¶¶ 31-35; Dervishi, 653 F. App'x at 57-58 (current placement is "operative placement actually at the time when the due process proceeding was commenced").

   c.      In addition to tuition, the Parent sought an order in 2017 from both the original IHO Brandenberg, as well as current IHO Kandilakis directing the District to lawfully resume A.A.'s transportation to NYMA.  They both refused.

      i.      The IDEA defines "free appropriate education" to include "special education and related services," 20 U.S.C. § 1401(9); and the term "related services" is defined to include transportation.  See 20 U.S.C. § 1401(26)(A).

      ii.      The Second Circuit has specifically applied the stay-put provision to requests for related services.  See Doe, 790 F. 3d at 452; see also T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist. 752 F.3d 145, 151 (2d Cir. 2014).

iii.     Though these legal authorities were all cited to the IHO, he denied the request without any discussion.

*ii.     Denial of FAPE Procedurally and Substantively*

129.    Tuition reimbursement and transportation are also required because the District failed to offer FAPE. The Parent demonstrated that the IEP for this school year was legally invalid for any one of the following reasons.

a.      <u>Failure to Notify Parent</u>: Just as in each of the prior years, the District failed to notify the Parent of a CSE meeting allegedly held on May 31, 2017. <u>See</u> <u>supra</u> ¶ 27 (legal requirements).

i.     Yet, the IHO simply notes that the Parent was not present at the CSE meeting, without addressing the fact that there is no evidence that notice of the CSE meeting was even mailed. There is no post-marked envelope evidencing mailing. Indeed, David Carlson, who had replaced Mr. Fucci, testified that he had no knowledge of how or if the May 31, 2017 meeting notice was sent out. Moreover, he acknowledged no email was sent to the Parent.

ii.    The Parent testified she was never notified about the meeting and "would have absolutely attended every meeting" had she been invited.

iii.   Moreover, after this alleged meeting date, Mr. Carlson admitted he approved busing A.A. to his new school at NYMA, which was then improperly reversed. <u>See</u> <u>supra</u> ¶¶ 62-78. The District never held a new CSE meeting or issued a Prior Written Notice of this action as required whenever a material condition is changed. <u>See</u> 34 C.F.R. § 300.503(a) ("Written notice . . . must be given to the parents of a child with a disability a reasonable time before the public

agency proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child . . . ."); M.M. ex rel. J.S. v. N.Y.C. Dep't of Educ., 2015 WL 1267910, at *6 (S.D.N.Y. March 18, 2015) (explaining that 34 C.F.R. § 300.503(a) "require[s] the public agency to send a written notice to the parent of the child if the public agency proposes to initiate or change the placement or the IEP").  As relevant here, the related service of transportation constitutes "the placement."

b.      Untimely IEP:  Yet again, the PWN and IEP were not delivered to the Parent in a timely manner and the IHO again fails to address this issue.  See supra ¶¶ 20-21 (legal requirements).

    i.      The Parent did not receive the PWN for 2017 until it was sent with the IEP on September 22, 2017 via regular mail and September 29, 2017 via certified mail.

    ii.      While the District's claim is murky, they appear to suggest the IEP was sent to the Parent in late August 2017.  Yet, Mr. Carlson testified that he had no idea why the PWN letter, dated May 31, 2017, with the IEP would have been sent just before school started.

    iii.      8 N.Y.C.R.R. § 200.5(a)(1) requires the District to send the PWN "a reasonable time before the school proposes" an IEP.  This rule was violated, even by the District's own alleged timeline.

    iv.      It bears repeating that despite the District's alleged CSE meeting and work on an IEP, they failed to notify Ms. Avaras of this even though she was in direct communication with Mr. Carlson and later the Superintendent and Assistant

Superintendent, throughout July and August 2017, well before school started.  See supra ¶¶ 60-78.

    i.     During this time, she requested and received transportation and had detailed discussions about the ongoing litigation as to prior years, and not a single District representative initiated a discussion with her about an IEP for the upcoming school year.

    ii.     No one asked why she did not attend the CSE meeting, whether she would consent to evaluation, or whether she wanted to see a draft of the IEP.

    iii.     To the contrary, they consented to bus A.A. to NYMA without any question or objection.

    iv.     The first time they told Ms. Avaras about an IEP was 10 days after A.A.'s school year had begun, and he was immersed in new cadet training at NYMA. They did so through their outside litigation counsel in an emailed letter on August 31st.

    v.     They then actually sent the IEP long after the July 1st deadline and well after school had started, not until September 22, 2017.

c.    <u>Outdated Information in IEP</u>:  Just as in prior years, the IEP was totally outdated. It was virtually identical to the prior year's stale information.  See supra ¶¶ 22-23 (legal requirements).

    i.     Given that Judge Roman's decision in favor of the Parent had been issued just over a month before this IEP was prepared, the District (presumably with the assistance of outside counsel) inserted in the IEP an assertion that the District made three separate efforts to "secure consent for re-evaluation."

ii.    As the Parent's brief explained to the IHO, there is no support whatsoever for this bald assertion and no records that the C.F.R. required the District to maintain to evidence such efforts.  See supra ¶ 27.

iii.    Indeed, Mr. Carlson testified that he was not aware of anyone reaching out to Arlington for the IESPs.  He admitted that on May 31, 2017, the District "did not know what the student's current functioning levels in skills were."

iv.    Had the District checked with either Arlington or the Parent, they would have learned that she had provided consent for all reevaluations and that current evaluations were readily available to them.  They never bothered.

v.    Yet, again without analysis, the IHO simply accepted the IEP's self-serving assertion about failed efforts to contact the Parent.

d.    No Transition Planning:  In addition to being outdated, the IEP did not adequately address transitional planning for a 15 year-old as legally required by New York State regulations.  See 8 N.Y.C.R.R. § 200.4(d)(2)(ix)(a).

i.    While the District made a superficial attempt to address the transition services requirement in the IEP, it used outdated, generic information and, critically, did so without the Parent's participation, in violation of 8 N.Y.C.R.R. § 200.4(d)(2)(ix)(b) ("development of transition goals and services . . . shall include a discussion with the student's parents" of graduation requirements and student's progress).  The student must also be invited to participate in a discussion of interests and vocational goals.

ii.    Yet, the IHO, without explanation, found that adequate transition services were provided by the District.

48

e.    <u>False or Incomplete Information</u>:  The IHO also ignored entirely the false information in the IEP and the PWN that the Parent brought to his attention.

    i.    The IEP stated that "student electives aligned with student interest."  This was fictitious because the District had no way of knowing what A.A.'s interests were as they never invited him to participate in planning.

    ii.    The PWN falsely claimed that the CSE considered less restrictive programs and/or services "but rejected those due to the student's current functioning levels and skills."  Mr. Carlson admitted they had no idea what A.A.'s "current functioning levels" were.

    iii.    Moreover, as in prior years discussed above, the IEP sent to the Parent did not include the Summary of Programs and Related Services, the attendees of the meeting, or the meeting notes.

f.    <u>Inappropriate Recommendations of IEP</u>: As in prior years, the District repeated the wrongheaded recommendation of integrated co-taught classroom with 24 to 30 students.  It was inappropriate then and remained inappropriate for A.A. for 2017/18.  <u>See</u> <u>supra</u> ¶ 102.

    i.    It also recommended occupational therapy two times per month, and then contradicted itself by recommending it one time per month, demonstrating yet again that the District was just going through the motions rather than focusing on truly offering FAPE.

    ii.    As the Arlington IESPs demonstrate, A.A. had not needed occupational therapy since 2014.

      iii.      Although each of these deficiencies were identified for the IHO, he ignored them all without discussion.

g.    <u>Board Did Not Approve the IEP</u>:  The notice of board review letter is missing a critical sentence that appears in all other letters: the representation that the Board of Education legally approved or supported the IEP.

      i.      Mr. Carlson said he had no idea why the statement was missing.

      ii.      In an effort to prove that the Board did approve the IEP, the District introduced a document to show that, on July 17, 2017, the Board approved the IEP created on May 31, 2017.

      iii.      But that claim is at odds with District representatives' unequivocal testimony that, as of August 2017, the IEP was still in <u>draft</u> form.  When confronted with this, Ms. Lynn Rafalik, Assistant Superintendent of Special Education, said that it was "[a]n error on the part of the special ed office" to send a draft IEP.

      iv.      Even granting this most charitable judgment, it remains clear that the Board never approved the purported IEP, and it was therefore not in effect.

      v.      The IHO disregarded this fundamental deficiency as well.

130.    Notwithstanding the combination of procedural and substantive deficiencies in the IEP and the process leading up to its creation, the IHO concluded it complied with the law and offered FAPE.  He did so without addressing a single one of the deficiencies highlighted by the Parent.

*iii.    NYMA is an Appropriate Alternative*

131.    The record amply demonstrated that NYMA offers an appropriate alternative educational program that has enabled A.A. to thrive academically and socially.  Every single witness to testify to its program supports this conclusion.

132.    Maria Reeves, Dean of Academics at NYMA, testified about both the individualized educational program at NYMA, as well as A.A.'s progress to date.

    a.    She explained that NYMA approaches "each student individually."  Efforts to address specific deficiencies or weaknesses include daily tutoring, "so if he did have any academic needs that they would be addressed."  The school provides academic advisors to all students.  Students meet with them daily in a "tutorial period."  Every four weeks, a student's schedule is reevaluated.

    b.    A.A. attends a Spanish class that is suited to his level.  In Algebra, his teacher determined that he needed additional support so "they created another section to her roster of classes."  He meets with a biology teacher twice a week for extra help, a history teacher once a week, and his adviser once a week.  He also receives supervised study hall on a one-on-one basis.  In addition to all this, the tutorial is mandatory for two hours each night.

    c.    The Parent introduced in evidence a chart she created that provides a comparison between the programs the IEP recommended and those that NYMA provides.  This chart was reviewed and approved by John Dolan, the Director of Admissions.  Ms. Reeves agreed with the entries and said it could be even more detailed.

    d.    She also went over A.A.'s progress reports, which demonstrated his progress as a student.

    e.    Ms. Reeves described A.A.'s social and emotional adjustment to NYMA.

        i.    Significantly, A.A. was the only freshman promoted to corporal and was a squad leader. She referred to him as "a stand out."

        ii.    He was selected to be a school ambassador through the admissions department, meeting new prospective students and their parents.

        iii.    He was also selected to be on the honor board, which considers students brought up on disciplinary matters.

    f.    Ms. Reeves did not hesitate in her conclusion that NYMA provides A.A. with an appropriate education.

133. The Parent testified to her extreme satisfaction with the NYMA program and the progress A.A. had already shown.

134. Dr. Braniecki, AA's neuropsychologist and expert witness also testified that, based on her knowledge of A.A.'s learning disability and ADHD, as well as her recent meeting with him, A.A.'s adjustment to NYMA was "very positive" and that his current placement "appears to be an appropriate placement for him." She also noted that it would not be in his best interest to change schools.

135. Also in the record was the opinion of A.A's pediatrician, Dr. Satran, who commented on the benefits of NYMA's educational program for A.A.'s diagnoses.

136. Finally, A.A. testified to his own progress at NYMA. With maturity and poise beyond his years, A.A. calmly described the extreme difficulty he had experienced while in the public school district where he felt stigmatized and bullied because of his learning disability; he described how his learning advanced dramatically through his experience at Hawk Meadow and, finally, how happy he was at NYMA. He described his progress there in simple, clear terms.

The District's counsel did not even try to cross examine him but praised him for his poised presentation.

### iv.    Equities Favor Reimbursement

137.    The record is abundantly clear that the District not only failed to offer FAPE for 2017/18, it did not even try.  The slapdash manner in which the District went through the bare motions of pretending to comply with the IDEA was proven by the record and testimonial evidence at the hearing.  It was all a façade.

138.    Moreover, the District's representatives retaliated against the Parent for continuing to pursue federal litigation.

> a.    The hearing testimony revealed that the District first agreed to bus A.A. to his placement at NYMA but then sharply reversed course only after the Parent filed a cross appeal and had an unpleasant meeting where she unsuccessfully urged District representatives to end the litigation.  See supra ¶¶ 54-78.
>
> b.    The Parent's new counsel then provided a detailed rebuttal to the District's new, purported bases for rejecting transportation.  It was all in vain.

139.    For her part, the Parent continued to proceed in good faith.  She engaged in a resolution process meeting on October 20, 2017, with the Assistant Superintendent of Special Education, Ms. Rafalik, inviting her to observe A.A. at NYMA and providing consent.  And she made a number of other proposals detailed in an email to Ms. Rafalik following the meeting.  Those overtures were made in October 2017.  Yet to date, neither Ms. Rafalik nor any other District representative followed up with the Parent or made any other effort to engage with her in good faith.

140.    The balance of equities is incontrovertibly in the Parent's favor.

**H.      The State Review Officer Demonstrates Bias Against the Parent**

141.    After the IHO rendered his decision rejecting each and every one of the Parent's claims without discussing any one of the points the Parent made at the hearing, the Parent filed a notice of intent to seek review from the SRO on March 26, 2018.

142.    NYSED deemed it appropriate to assign this appeal to the same SRO, Justyn Bates, who had rejected the Parent's claims in the first due process complaint.  As Judge Roman had found, this SRO had rejected those claims without taking into account key testimony and evidence favorable to the Parent.

143.    Now, faced with a new appeal involving an IHO decision that on its face was unsustainable, the SRO found a convenient way to reject claims relating to four separate school years.  By decision dated May 17, 2018, the SRO dismissed the appeal because it was inadvertently served on the District the following morning after the due date.

144.    A request for review must be personally served within 40 days after the date of the IHO's decision.  8 N.Y.C.R.R. § 279.4(a).  In this case, the Parent was required to personally serve the Request for Review upon the District no later than April 16, 2018.

145.    Plaintiff's Request for Review and Memorandum of Law were served on the District on April 17, 2018 at 9:03 a.m. instead of on the evening of April 16, 2018.

146.    The reason for this short delay was set forth in the Parent's cover letter to the SRO dated April 17, 2018.  The Parent's counsel used a process serving agency, Elite Legal Services ("ELS"), and for some unknown reason, this agency served it on the morning of the 17th rather than the evening of the 16th.

147.    A copy of the appeal was sent to the District's counsel and counsel made no objection to the brief delay.  But, in its formal response to the appeal, the District raised the delay as one of the bases for rejecting the claims.

148.    The Parent promptly filed a reply to address the narrow issue of the delay. The reply demonstrated that the delay was not the fault of the Parent's counsel and certainly totally outside the control of the Parent. Moreover, the reply set forth abundant legal authority for the fact that, under these circumstances, the SRO should apply his discretion to excuse the delay.

149.    Specifically, the reply explained through sworn affidavit and attached email communications that the Parent's counsel Park Jensen Bennett LLP ("Counsel") instructed the process serving agency, ELS, to serve the Request for Review and Memorandum of Law on the District by April 16, 2018. The documents were emailed to ELS on April 16, 2018 to be served on the same day. Notwithstanding the instruction, the service agency failed to comply:

a.    On April 11th, Ms. Coughlin, a paralegal employed by Counsel emailed ELS to arrange for service of the documents to the District on April 16th.

b.    On April 12th, Ms. Coughlin called ELS to confirm receipt of the above request and was told ELS would serve the documents on April 16th.

c.    On April 16th, Ms. Coughlin sent the documents to ELS via email.

d.    On April 16th, Ms. Coughlin then called ELS to confirm receipt of the above email and the attached documents. She was told ELS had received the documents, and the documents would be served that day (April 16th).

e.    On April 17th, Ms. Coughlin called ELS to confirm that they were preparing the affidavit of service. Counsel was told the documents had been served on the District that morning because the person responsible for serving the documents, Samuel Berk, was not aware of the April 16th deadline.

f.    The Affidavit of Service shows that the District was served at 9:03 a.m. on April 17th.

55

g.      Counsel had used ELS to serve the District with papers on at least three prior occasions without any service issues and had no reason to anticipate that such a delay would occur.

h.      Upon learning of this error on April 17th, Counsel contacted the attorney for the District, Ms. Carol Melnick, via email and explained the issue with service. Included in this email to Ms. Melnick was the Request for Review, Memorandum of Law, and Forms B and D. Ms. Melnick acknowledged receipt of the email, raising no objections or claimed prejudice.

150.    In addition to submitting this evidence, the Parent demonstrated to the SRO that such circumstances clearly constituted good cause and an event that the filing party – the Parent - had no control over. Certainly, the Parent should not have been prejudiced by the inexplicable mistake of a service provider used by Counsel.

151.    Among other authorities, the Parent directed the SRO's attention to 8 N.Y.C.R.R. § 279.13, which provides in pertinent part that an SRO "may excuse a failure to timely serve or file a request for review within the time specified for good cause shown." In Grenon v. Taconic Hills Central School District, the court found that "good cause for late filing would be something like postal service error, or, in other words, an event that the filing party had no control over." 2006 WL 3751450, at *5 (N.D.N.Y. Dec. 19, 2016) (citing Application of a Child with a Disability, Appeal No. 03-007 (late petition excused because error caused by overnight mail delivery service)).

152.    Importantly, the District did not argue that it was prejudiced in any way by the delay, and it served its Verified Answer and Memorandum of Law within the time specified and without asking the SRO for an extension. SROs have routinely excused late filings where the receiving

party was not prejudiced by the delay.  See, e.g., Application of a Child with a Disability, Appeal No. 97-036 at 5 ("Although petitioners' attorney has not offered an explanation for her brief delay . . . I find that there is no evidence before me that respondent has been prejudiced by petitioners' delay, which I will excuse.") (citations omitted); Application of a Child with a Disability, Appeal No. 00-062 at 5 ("[I]n the absence of any evidence of prejudice to respondent by petitioner's delay, I will excuse her delay in bringing this appeal.") (citations omitted).

153.    Moreover, neither the District nor the SRO in any way challenged the Parent's evidence establishing that the process server appears to have simply misunderstood the instructions, through no fault of the Parent or her counsel.

154.    Yet the SRO seized upon the delay (constituting less than 10 overnight hours) and rejected the appeal in its entirety.  He relied on two SRO opinions that are wholly inapplicable: Application of the Board of Education of the Harborsfield Central School District, Appeal No. 10-044, and Application of a Student with a Disability, Appeal No. 09-099.

      a.      In Harborsfield, Appeal No. 10-044, the District failed to explain the reason for their untimely filing (which was late by two days) and the District's attorney, who regularly argued the timeliness of petitions before the SRO, was well-versed in filing deadlines.  Id. at 3.  In contrast, here, the Parent was unaware that a delay would occur and when made aware, provided extensive and uncontroverted explanation for the short delay.

      b.      Similarly, in Appeal 09-099, the filing party miscalculated the deadline and was late by four days.  The appealing party did not even know of the miscalculation until they received the District's answer.  Id. at 2.  In contrast, here, the Parent's counsel was aware of and took all reasonable steps to ensure compliance with the service deadline.

155.    The SRO made no effort to address the evidence of factors outside the control of the Parent.  Instead, he seized on the technicality to deny any relief to the Parent's claims as to four separate school years.

156.    Having been denied any meaningful review of her substantive claims under the IDEA from either the IHO or the SRO, the Parent institutes this action.

I.    **The State Defendant Does Not Address Years of District Failures.**

157.    The SRO's conduct is consistent with the refusal by his employer, the Defendant NYSED, to remedy the persistent failures of the Defendant School District.

158.    Even the most cursory review of the New York State Education Department website reveals how deplorable Clarkstown's performance has been relative to the IDEA and its legal requirements.  Its data titled, "Special Education School District Data Profile," demonstrates that from school year 2005-2006 through 2016-2017, the District flunked a number of important metrics:

    a.    With the exception of school years 2008-2009 and 2012-2013, the District failed to meet state targets on state assessments each year from 2007-2017 for students with disabilities.

        i.    Moreover, for years 2009-2011 and 2014-2015:  the District failed to meet New York State targets each year in the category "performance on state assessments and adequate yearly progress" in English Language Arts for Grades 3-8.

        ii.    For years 2013 through 2017: the District failed to meet New York State targets each year in the category "participation in and performance on state assessments" in English Language Arts and Math for Grades 3-8.

58

b. With respect to the requirement for students transitioning to high school, the State measures the percentage of youth aged 15 and above with an IEP that includes coordinated, measurable, annual IEP goals and transition services that will reasonably enable the student to meet the post-secondary goals.

i. The District's purported IEP for the 2017/18 school year when A.A. would be 15 years old failed to provide for any meaningful transition services, nor could it since they never met with A.A. See supra ¶ 129(d).

ii. The State data on transition is not available for that year, but it is for prior school year 2015/16. The data shows that the District had an appropriate transition IEP for a mere 23.3% of its eligible students. The state target was 100%.

iii. In short, the District failed miserably, yet two years later, when it came time for A.A., the District threw together an IEP that did not involve a meeting with the student or the parent, or any consideration of ever inviting A.A. to a transitional meeting.

159. NYSED clearly failed to address the many deficiencies in the District's treatment of its disabled students.

160. More specifically, the District's treatment of A.A. and the Parent has been known to the State now for several years. In 2014, the Parent set forth her list of concerns in a federal complaint that named NYSED as a defendant. While NYSED was dismissed from the case on procedural grounds, it not only was on notice of her serious allegations of misconduct by the District as well as their own failure of oversight, but also was aware of Judge Roman's conclusion that the SRO had simply failed to take into consideration critical evidence in support of the Parent at her first due process hearing.

59

161.    Notwithstanding this history, NYSED assigned the latest appeal from a grossly inadequate IHO decision to the very same SRO who had inexplicably refused to consider the Parent's evidence the first time around.

162.    This was NYSED's last opportunity to scrutinize the District's conduct against the Parent and A.A.  The appeal raised, among other issues, the serious deficiency of the 2017/18 IEP where the District had engaged in no transition planning for the IEP, a metric the State's own data had shown the District had failed miserably in prior years.

163.    Yet, NYSED rejected the appeal on the basis of a technical, brief delay that it could have, but refused to, excuse.

**FIRST CAUSE OF ACTION - IDEA**

164.    The Parent repeats and re-alleges the allegations contained in each of the foregoing paragraphs 14 through 163 above as though fully set forth herein.

165.    The IHO erred in concluding that the Parent was time-barred from challenging the District's failure to provide a FAPE for the 2014/15 school year, and the District failed procedurally and substantively to develop an IEP for the 2014/15 school year.

166.    The Parent is entitled to tuition reimbursement as to the 2014/15 school year at Hawk Meadow pursuant to the pendency and "stay put" provisions of state and federal law.  See 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a); New York Educ. Law § 4404.4(a); supra ¶¶ 31-35, 83-91.

167.    The IHO erroneously denied A.A. tuition reimbursement for the 2014/15 school year under School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985).

168.    A.A. is entitled to a tuition award because all three Burlington prongs have been satisfied: (1) the District failed to provide A.A. with a FAPE for the 2014/15 school year; (2) A.A.'s

placement at Hawk Meadow was appropriate; and (3) equitable considerations do not preclude an award of tuition payment.

## SECOND CAUSE OF ACTION - IDEA

169. The Parent repeats and re-alleges the allegations contained in each of the foregoing paragraphs 14 through 163 above as though fully set forth herein.

170. The IHO erred in concluding that the Parent was time-barred from challenging the District's failure to provide a FAPE for the 2015/16 school year.

171. The Parent is entitled to tuition reimbursement as to the 2015/16 school year at Hawk Meadow pursuant to the pendency and "stay put" provisions of state and federal law. See 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a); New York Educ. Law § 4404.4(a); supra ¶¶ 31-35, 92-95.

172. The Parent is also entitled to tuition reimbursement as to the 2015/16 school year at Hawk Meadow because the District's 2015/16 IEP failed procedurally and substantively. See supra ¶¶ 96-103.

173. The IHO erroneously denied A.A. tuition reimbursement for the 2015/16 school year under School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985).

174. A.A. is entitled to a tuition award because all three Burlington prongs have been satisfied: (1) the District failed to provide A.A. with a FAPE for the 2015/16 school year; (2) A.A.'s placement at Hawk Meadow was appropriate; and (3) equitable considerations do not preclude an award of tuition payment.

## THIRD CAUSE OF ACTION - IDEA

175. The Parent repeats and re-alleges the allegations contained in each of the foregoing paragraphs 14 through 163 above as though fully set forth herein.

176.    The Parent is entitled to tuition reimbursement as to the 2016/17 school year at Hawk Meadow pursuant to the pendency and "stay put" provisions of state and federal law.  See 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a); New York Educ. Law § 4404.4(a); supra ¶¶ 31-35, 123.

177.    The Parent is also entitled to tuition reimbursement as to the 2016/17 school year at Hawk Meadow because the District's 2016/17 IEP failed procedurally and substantively.  See supra ¶¶ 124-125.

178.    The IHO erroneously denied A.A. tuition reimbursement for the 2016/17 school year under School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985).

179.    A.A. is entitled to a tuition award because all three Burlington prongs have been satisfied: (1) the District failed to provide A.A. with a FAPE for the 2016/17 school year; (2) A.A.'s placement at Hawk Meadow was appropriate; and (3) equitable considerations do not preclude an award of tuition payment.

## FOURTH CAUSE OF ACTION - IDEA

180.    The Parent repeats and re-alleges the allegations contained in each of the foregoing paragraphs 14 through 163 above as though fully set forth herein.

181.    The Parent is entitled to tuition reimbursement as to the 2017/18 school year at NYMA pursuant to the pendency and "stay put" provisions of state and federal law.  See 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a); New York Educ. Law § 4404.4(a); supra ¶¶ 31-35, 128.

182.    The Parent is also entitled to tuition reimbursement as to the 2017/18 school year at NYMA because the District's 2017/18 IEP failed procedurally and substantively.  See supra ¶¶ 129-130.

183. The IHO erroneously denied A.A. tuition reimbursement for the 2017/18 school year under School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985).

184. A.A. is entitled to a tuition award because all three Burlington prongs have been satisfied: (1) the District failed to provide A.A. with a FAPE for the 2017/18 school year; (2) A.A.'s placement at NYMA was appropriate; and (3) equitable considerations do not preclude an award of tuition payment.

**FIFTH CAUSE OF ACTION – Section 504 of the Rehabilitation Act**

185. The Plaintiff repeats and re-alleges the allegations contained in each of the foregoing paragraphs 14 through 163 above as though fully set forth herein.

186. Defendants District and NYSED each violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by discriminating against A.A. solely on the basis of his disabilities.

187. A.A. is a qualified individual with disabilities who has repeatedly been denied access to a free appropriate public education and accommodations designed to meet his individual needs as adequately as the needs of non-disabled children.

188. The Defendants engaged in associational discrimination against the Parent due to her association with, and advocacy for, her child, A.A.

189. As the District Court opinion in Avaras v. Clarkstown Central School District, 2017 WL 3037402 (S.D.N.Y. July 17, 2017), demonstrates, denial of FAPE by the Defendant District began at least in 2012/13 and continued in 2013/14.

190. As that opinion also demonstrates, the IHO and Defendant NYSED's employee, the SRO, ignored critical evidence favorable to the Parent in rejecting the Parent's challenges to the Defendant District's conduct.

191. As the foregoing allegations demonstrate, Defendant District systematically violated the state and federal laws and regulations regarding stay put from 2012/13 through the 2017/18 school year and to date, as well as FAPE in the least restrictive environment since at least 2011/12. Such allegations further demonstrate that the IHO and Defendant NYSED, through its employee the SRO, denied the Parent any meaningful review of the District's misconduct.

192. The Defendants have (a) adopted, implemented, and applied policies and practices that contravene federal and state law with respect to the development and implementation of IEPs, placements, programs, and accommodations for children with disabilities; and (b) failed to adopt, implement, and apply policies and practices to ensure the protection of the Parent's and A.A.'s rights under such laws.

193. The Defendants' conduct is gross, reckless, and intentional.

194. As a result of the policies, procedures, practices, acts and omissions of the Defendants, the Plaintiffs have suffered deprivation of their right to a free appropriate public education, emotional and psychological distress, anxiety, injury, and suffering. Plaintiffs will continue to be injured and/or at substantial risk of future injury unless the Defendants' systemic failures are remedied.

### SIXTH CAUSE OF ACTION – ADA

195. The Plaintiff repeats and re-alleges the allegations contained in each of the foregoing paragraphs 14 through 163 above as though fully set forth herein.

196. Defendants District and NYSED each violated the ADA, 42 U.S.C. § 12132, by discriminating against A.A. solely on the basis of his disabilities.

197. A.A. is a qualified individual with disabilities who has repeatedly been denied access to a free appropriate public education and accommodations designed to meet his individual needs as adequately as the needs of non-disabled children.

198. The Defendants engaged in associational discrimination against the Parent due to her association with, and advocacy for, her child, A.A.

199. As the District Court opinion in Avaras v. Clarkstown Central School District, 2017 WL 3037402 (S.D.N.Y. July 17, 2017) demonstrates, denial of FAPE by the Defendant District began at least in 2012/13 and continued in 2013/14.

200. As that opinion also demonstrates, the IHO and the Defendant NYSED's employee, the SRO, ignored critical evidence favorable to the Parent in rejecting the Parent's challenges to the Defendant District's conduct.

201. As the foregoing allegations demonstrate, Defendant District systematically violated the state and federal laws and regulations regarding stay put from 2012/13 through the 2017/18 school year and to date, as well as FAPE in the least restrictive environment since at least 2011/12. Such allegations further demonstrate that the IHO and Defendant NYSED, through its employee the SRO, denied the Parent any meaningful review of the District's misconduct.

202. The Defendants have (a) adopted, implemented, and applied policies and practices that contravene federal and state law with respect to the development and implementation of IEPs, placements, programs, and accommodations for children with disabilities; and (b) failed to adopt, implement, and apply policies and practices to ensure the protection of the Parent's and A.A.'s rights under such laws.

203. The Defendants' conduct is gross, reckless, and intentional.

204.    As a result of the policies, procedures, practices, acts and omissions of the Defendants, the Plaintiffs have suffered deprivation of their right to a free appropriate public education, emotional and psychological distress, anxiety, injury, and suffering.  Plaintiffs will continue to be injured and/or at substantial risk of future injury unless the Defendants' systemic failures are remedied.

### SEVENTH CAUSE OF ACTION – SECTION 1983

205.    The Plaintiff repeats and re-alleges the allegations contained in each of the foregoing paragraphs 14 through 163 above as though fully set forth herein.

206.    The Defendants, and each of their agents, representatives and employees, acting under color of state law and within the scope of their respective employment, violated the Plaintiffs' constitutional rights to due process, and they are entitled to relief pursuant to 42 U.S.C. § 1983.

207.    A.A. has repeatedly been denied access to a free appropriate public education and accommodations designed to meet his individual needs as adequately as the needs of non-disabled children.

208.    The District began denying A.A. FAPE in the LRE since at least 2011/12 and continued to the present.

209.    The District retaliated against the Parent and A.A. for their exercise of their legal rights to pursue all remedies under the IDEA, by among other things, repeatedly creating IEPs without affording the Parent and A.A. a meaningful opportunity to participate in CSE meetings, repeatedly creating IEPs the District knew or should have known would be inappropriate for A.A.'s individualized needs, and denying transportation and related services to NYMA.

210.    The IHO and Defendant NYSED's employee, the SRO, repeatedly and consistently ignored critical evidence favorable to the Parent in rejecting the Parent's challenges to the Defendant District's conduct.

211.    Infected by bias against the Parent and A.A., the hearing and appeal process was a sham that Defendant NYSED condoned and supported.  The New York State Education Department denied the Parent any meaningful review of the District's misconduct.

212.    The Defendants have (a) adopted, implemented, and applied policies and practices that contravene federal and state law with respect to the development and implementation of IEPs, placements, programs, and accommodations for children with disabilities; and (b) failed to adopt, implement, and apply policies and practices to ensure the protection of the Parent's and A.A.'s rights under such laws.

213.    By failing to supervise, train, and monitor administrators and employees concerning compliance with the IDEA and related regulations and state and federal law, Defendants have deprived the Plaintiffs of their rights to educational services to which they are entitled and have acted intentionally and/or with callous disregard of the Plaintiffs' rights.

214.    As a result of the foregoing acts and omissions by the Defendants, the Plaintiffs have suffered deprivation of their right to a free appropriate public education, emotional and psychological distress, anxiety, injury, and suffering.  Plaintiffs will continue to be injured and/or at substantial risk of future injury unless the Defendants' systemic failures are remedied.

**EIGHTH CAUSE OF ACTION – STATE EDUCATION LAW**

215.    The Plaintiff repeats and re-alleges the allegations contained in each of the forgoing paragraphs 14 through 163 above as though fully set forth herein.

216.   Defendants have violated the Plaintiffs' rights under the N.Y. Educ. Law § 4401, *et seq.*, and 8 N.Y.C.R.R. Part 200 by failing to:

a.   provide A.A. with special education and related services;

b.   adhere to procedural safeguards, notice, and due process requirements relative to such educational services;

c.   adequately train administration and staff to ensure compliance with IDEA mandates;

d.   effectively monitor the District for compliance with the IDEA; and

e.   ensure, through agency enforcement procedures, the District's compliance with the IDEA.

217.   As a result of the Defendants' conduct Plaintiffs have been injured and will continue to be injured and/or at substantial risk of future injury unless the Defendants' systemic failures are remedied.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action on all issues and claims for relief for which trial by jury is provided by law.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court:

1.   Issue an injunction directing the District, under the stay put and pendency provisions of federal law, to provide payment of tuition for A.A. to remain in NYMA's full program as the last effective placement, for all school years, pending final disposition of the instant and related litigation, and for transportation as a related service thereafter.

2.    Order the District and the New York State Education Department to reimburse Plaintiff Connie Avaras for the cost of tuition at Hawk Meadow for school years 2013/14 through 2016/17, to reimburse Plaintiff Connie Avaras for the cost of transportation to and from Hawk Meadow for school year 2013/14, and to reimburse Plaintiff Connie Avaras for the cost of tuition and related services and expenses at NYMA for school year 2017/18.

3.    Award Plaintiff Connie Avaras compensatory and punitive damages in an amount to be determined.

4.    Award Plaintiff A.A. compensatory and punitive damages in an amount to be determined.

5.    Award Plaintiff Connie Avaras costs and attorney's fees of the instant and related litigation, and

6.    Grant such other and further relief as may be appropriate.


Dated: August 2, 2018
          New York, New York

                              Respectfully submitted,

                              PARK JENSEN BENNETT, LLP

                              By: _____
                                    Tai H. Park

                              *Attorney for the Plaintiffs*

                              40 Wall Street, 41st Floor
                              New York, NY 10005
                              Ph: 646-200-6310
                              Email: tpark@parkjensen.com


69